**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

ROY EASON,

      Plaintiff,

  v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security

      Defendant.

Case No. 3:14-cv-00076-SLG

## MEMORANDUM DECISION AND ORDER

  Roy Eason initiated this Social Security action in federal district court after exhausting his administrative remedies.  Mr. Eason seeks the reversal of an unfavorable disability determination by the Commissioner of Social Security.  The matter has been fully briefed.[1]  Oral argument was not requested and was not necessary to the Court's determination.

  For the reasons discussed below, the Commissioner's determination will be affirmed.

## BACKGROUND

  Mr. Eason is 47 years old and has nine years of formal education.[2]  He alleges that he is disabled due to back pain, diabetes, high cholesterol, obesity, and major

---

[1] *See* Dockets 17 (Brief), 20 (Opp.), 21 (Reply).

[2] *See* Docket 29 (Administrative Record [hereinafter A.R.]) 116, 120.

depressive disorder.[3]  Mr. Eason was employed between 1996 and 2006 "fabricating [and] building springs" and has also worked for brief periods of time as a car detailer, seafood processor, and agricultural worker.[4]  He self-reports no employment after March 2007.[5]  According to his medical records, Mr. Eason was injured in a fall while working in 2007, which has caused pain in his back and lower extremities.[6]

## I.    Mr. Eason's Application for Social Security Benefits

On January 30, 2012, Mr. Eason applied for disability insurance benefits under Titles II and XVI of the Social Security Act, alleging a disability onset date of November 5, 2011.[7]  On May 4, 2012, the Social Security Administration determined that Mr. Eason was not disabled.[8]  Mr. Eason promptly requested a hearing before an administrative law judge ("ALJ").[9]  The hearing was held on November 14, 2012 before ALJ Paul Hebda.[10]

## II.   The Administrative Record

The record before the ALJ reflected the following:

### A. Medical Evidence

---

[3] A.R. 28, 116.

[4] A.R. 272; *see also* A.R. 69.

[5] *Id.*

[6] A.R. 308.

[7] A.R. 236.  Mr. Eason had a previous claim for disability which was denied in a final decision dated November 4, 2011.  A.R. 95.

[8] A.R. 103–04.

[9] A.R. 166–67.

[10] A.R. 41.

The ALJ had before him approximately 90 pages of medical records documenting Mr. Eason's treatment, primarily for back pain and diabetes.[11] Those records are summarized in the following paragraphs.

In January 2010, Mr. Eason was seen at the Alaska Spine Institute on referral for pain and numbness in his lower back and extremities.[12] Records from that consultation indicate that a December 2009 MRI of the lumbar spine showed "moderate lumbrosacral epidural lipmatosis causing moderate central spinal canal stenosis at L2-L3 throughout."[13] At that January 2010 visit, Mr. Eason reported his medications as "Glipizide, hydrochlorothiazide, lisinopril, lovastatin, metformin, nortriptyline, Norvasc, TriCor, [and] amlodipine." [14] Alaska Spine Institute referred Mr. Eason for a neurosurgical opinion.[15]

In February 2010, Mr. Eason was seen at Alaska Neuroscience Associates by Dr. Paul Jensen.[16] Dr. Jensen ordered a CT scan, which "corroborate[d] the known diagnosis of facet arthropathy at L4-5 and L5-S1. There were early bridging steophytes at 5-1 and some diastatic changes at 4-5. This again was more focal geographically with the location of his reported pain. In terms of the findings higher in the lumbar spine at L2-3, he does

---

[11] *See* A.R. 307–398.

[12] A.R. 307–98.

[13] A.R. 314.

[14] A.R. 308.

[15] A.R. 309.

[16] A.R. 316–20.

not have a consistent history of an effort-type pain where he stands and/or walks with ensuing back pain, and obtains relief by sitting."[17]

The administrative record also included medical records from Providence Alaska Medical Center documenting several visits by Mr. Eason including visits for back pain in December 2009 and February 2010, knee pain in July 2010, flu-like symptoms in October 2010, and stroke symptoms in January 2011. [18]

On October 13, 2011, Mr. Eason presented to Dr. Juliana Shields for a medication refill. At that visit he admitted to "ongoing depression and dysthymia," but denied "frank suicidal ideation." The record also indicates that Mr. Eason reported that he "has been walking intermittently but not getting a significant amount of exercise. He continued to complain of low back pain." At that visit, Dr. Shields prescribed or refilled medications to treat back pain, diabetes, hypertension, and depression.[19]

On December 1, 2011, Mr. Eason returned to Dr. Shields. At that visit he requested that Dr. Shields complete a Capacity Assessment form for SSI/Disability. Dr. Shields summarized Mr. Eason's status, noting:

> The patient reports that his pain is essentially unchanged. It is predominantly in his low back and at worst is 9/10. It does not radiate. I reviewed his record at length. He has seen Dr. Gevaert at ASI and Dr. Jensen of neurosurgery. Surgical intervention was thought unlikely to be of benefit. The patient was offered a facet joint injection, as he does have some facet joint arthropathy, however the patient declined secondary to his severe phobia of needles and the fact that a steroid

---

[17] A.R. 316.

[18] A.R. 321–43.

[19] A.R. 389–91.

injection is not likely to be definitive treatment.[20]

Under "Assessment Plan," Dr. Shields wrote

> CHRONIC LOW BACK PAIN:  I am unable to complete the patient's functional evaluation assessment.  He is referred to physical therapy for this. . . . I do not feel that I know the patient well enough after meeting him once, nor do I know his functional limitations well enough to complete the number of hours he is able to work a day.  Clearly due to his ongoing limitations he is not able to work a full-time job.  I have also reviewed the previously completed Health Status Questionnaire completed by Dr. Scofield who agreed that the patient was not able to work either any full-time or part-time capacity.
>
> DEPRESSION:   The patient has severe and debilitating depression, this likely impairs his ability to work as well.  He is not able to tell me why he is not on an antidepressant at present.  He is not able to tell me with any reasonable answer or judgment why he has not followed through with psychiatric evaluation.  I will refer him initially to our in-house psychology for counseling, and we will initiate antidepression treatment with amitriptyline in hopes that this will address his chronic pain as well.  I will refer him to psychiatry in the very near future if the amitriptyline is not of significant benefit.  He is not actively suicidal.[21]

On March 15, 2012, Mr. Eason was seen by Dr. Sarah Roberts for a medication refill.  Dr. Roberts noted that while Mr. Eason indicated that "he can afford his meds," he had been "out of 'all' of his meds for about 2.5 months.  He continues to have chronic back pain, but is seeking disability for this."[22]  On March 19, 2012, Mr. Eason was seen by Dr. Jacquelyn Serrano as a follow-up for high blood pressure.  Dr. Serrano indicated

---

[20] A.R. 396.

[21] A.R. 397.

[22] A.R. 394.

that Mr. Eason "reports that he had run out of his medicines and that's why his blood pressure was so high. He was given a refill and he started taking his medications. Now his blood pressures have improved."[23] Dr. Serrano also noted that Mr. Eason "is checking his blood sugars as directed. He denies episodes of hypoglycemia. He continues to have chronic daily back pain."[24] Dr. Serrano also noted that Mr. Eason "walks with a cane" and "moves very slowly as if in pain."[25]

On March 21, 2012, Mr. Eason underwent a "Physical Work Performance Evaluation," a two hour testing regimen conducted by an occupational therapist.[26] The summary of that evaluation states:

> **Minimal Overall Level of Work: Falls within the Light range.** Exerting up to 20 pound of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligence amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. . . . *Please note that the overall level of work was significant influenced by the client's self-limiting behavior. Therefore, the Light level of work indicates a minimum ability rather than a maximum ability. A maximum overall level of work cannot be determined at this time due to the self-limiting behavior.*[27]

The evaluator also stated:

> **Tolerance for the 8-Hour Day:** Due to the client's limited

---

[23] A.R. 392.

[24] *Id.*

[25] A.R. 392.

[26] A.R. 333–43.

[27] A.R. 333 (italics in original).

ability to walk and stand, he would have to alternate between standing, walking and other tasks as limited in the task performance to be able to tolerate the Light level of work for the 8-hour day/40-hour week. *Please note that the tolerance for the 8-hour day was significantly influenced by the client's self-limiting behavior and indicates his minimal rather than his maximal effort.*[28]

Under "Subjective Pain Statements," the evaluator noted that Mr. Eason "states he is in pain all the time at home; his pain wakes him up; he is not comfortable sleeping; he uses his cane while walking due to pain and posture; he states his pain makes him angry." Under "Pain Behaviors and their Impacts on Test Results," the evaluator noted "[c]ursing; facial grimacing; pain comments; position changes. He was clearly uncomfortable even before we started the testing." And under "Body Mechanics and Movement Patterns," the evaluator noted that Mr. Eason "demonstrated impaired body mechanics and movement patterns during the test due to pain and tightness/stiffness in his back and legs."[29] After detailing the individual tests and their results, the evaluator concluded that the "test suggests he can work at the light level with a job that allows moving between sitting, standing and walking. Unfortunately, all the jobs he's had have been medium or higher jobs, and he does not have a good skills set for office work. He has not graduated from high school."[30]

On April 27, 2012, Mr. Eason was again examined by Dr. Shields. Although presenting for "hypertension, diabetes hyperlipidemia and depression," the visit focused

---

[28] A.R. 334 (italics in original).

[29] A.R. 335.

[30] A.R. 338.

largely on Mr. Eason's mental health, and Dr. Shields requested an immediate evaluation for depression.[31] Mr. Eason was examined that same day by Dr. Parret, a psychologist. Dr. Parret recorded that Mr. Eason reported "feeling depressed and isolating himself from family." She added that Mr. Eason reported that he had "thought about hurting himself in the past and always has a plan, but has never acting [sic] on the plan." Dr. Parret referred Mr. Eason to counseling. Dr. Parret's assessment stated:

> Pt [a]ppeared depressed and not functioning well in his daily life. He is likely in a lot of pain which is worsened by his depressive state. He was hesitant to share much information with this clinician which may be telling for how well he will do participating in therapy. His guarded state is likely a protective factor for himself, but makes it difficult to try and help him medically as well as provide mental health services.[32]

On June 20, 2012, Mr. Eason received a follow-up exam by Dr. Shields. Dr. Shields directed Mr. Eason to call his pharmacy to refill his medications for hypertension and diabetes. Dr. Shields noted that Mr. Eason "has ongoing difficulty with depression" and arranged for him to contact the counseling department to schedule an appointment. Dr. Shields also refilled Mr. Eason's Tramadol prescription for back pain.[33]

The administrative record includes counselor's notes for four counseling sessions that Mr. Eason attended between June and November 2012.[34] Of note is Mr. Eason's "Behavior Health Intake Assessment" of June 26, 2012. On that date, he reported

---

[31] A.R. 352–53.

[32] A.R. 351.

[33] A.R. 349–50.

[34] A.R. 354–65, 368–86.

depression from his inability to find work due to his back injury and thoughts of self-harm. However, Mr. Eason also reported on that date that "he could never kill himself because he loves his three children too much."[35]

On September 18, 2012, Mr. Eason was examined by Dr. Susan Hayner for medication refills and "blisters on his feet." Dr. Hayner noted that Mr. Eason "doesn't check his sugar because he doesn't have a meter and doesn't like to check blood sugars. He is very afraid of needles."[36] Dr. Hayner concluded that the blisters were likely friction blisters, provided refills of Mr. Eason's pain medication, and referred him to massage therapy for his lower back pain.[37]

### B. Testimony of Mr. Eason

Mr. Eason attended the November 14, 2012 administrative hearing with counsel. Under examination by his attorney, Mr. Eason testified that he had painful blisters on the bottom of his feet that caused a burning pain and indicated that he needed to take insulin to remedy the condition.[38] He testified that he was not taking insulin because he did not have any, and that he did not expect to be able to pay for it in the future.[39]

Mr. Eason also testified that it helps with his discomfort when he lies down. He testified that he could sit for "an hour" and then needed to "get up and move around, walk

---

[35] A.R. 384.

[36] A.R. 387.

[37] A.R. 388

[38] A.R. 52.

[39] A.R. 53–54.

around a bit" with the help of a cane prescribed by a doctor.[40] He testified that he uses the cane "all the time" and can stand with it for an hour but "not long" without it and can walk approximately 50 feet with a tolerable amount of pain.[41] Mr. Eason added that his back pain affects his sitting and standing and is "throbbing pain, all the time."[42] Mr. Eason also testified that his medications make him drowsy; as a result he does not always take them because he is a caregiver for his two teenage boys.[43] He added that his back pain makes his legs numb.[44]

Mr. Eason also testified that he sleeps most of the day and doesn't sleep well at night when he takes his medication.[45] He testified that his high blood pressure makes him dizzy, and sometimes requires multiple medications to control.[46] And he testified that while his medical records noted that he had not taken his blood pressure medication in the past, of late he had been taking it and as a result, he no longer had dizziness or nosebleeds.[47] Mr. Eason testified that he has a ninth grade education and that he "cannot

---

[40] A.R. 54. With the exception of the March 19, 2012 visit with Dr. Serrano (A.R. 392) and the December 1, 2011 visit with Dr. Shields (A.R. 397), none of Mr. Eason's medical professionals record his use of a cane. No medical records document the necessity of the cane or its prescription by a physician.

[41] A.R. 55.

[42] A.R. 56.

[43] A.R. 56–57.

[44] A.R. 58.

[45] *Id.*

[46] A.R. 60.

[47] A.R. 59.

read at all" and relies on his sons to help with taking his medications.[48]

### C. Testimony of Betty Ann Lees

At the hearing, Betty Ann Lees, an independent vocational expert, requested that the ALJ ask Mr. Eason about his ability to count money and make change, given his asserted illiteracy. Mr. Eason responded that he could count money and differentiate between the denominations of bills.[49]

Ms. Lees then testified to Mr. Eason's previous employment and the associated DOT classifications.[50] The ALJ then posed to Ms. Lees the following hypothetical:

> An individual of the claimant's age, education, and past work experience who can perform light level work as defined by the Social Security Administration with the following [sic] climbing of ramps or stairs, ladders, ropes, scaffolding, stooping, crouching, crawling, would all be at the occasional level. There would be the avoidance of concentrated exposure to extreme cold and there would be the avoidance of concentrated exposure to excessive vibration. Work would be limited to one to two step tasks with few if any work place changes with more verbal than written instructions.[51]

Ms. Lees testified that such an individual would not be able to perform any of Mr. Eason's past relevant work history.[52] But she then testified that such a person could perform the DOT-described jobs of a thread cutter tender, a bobbin stripper, or a small products

---

[48] A.R. 62–63.

[49] A.R. 67–68.

[50] A.R. 69.

[51] A.R. 70.

[52] *Id.*

assembler in the existing national economy.  Ms. Lees noted that the latter two jobs each had an estimated 50 positions available in the Alaska economy.[53]  Ms. Lees also testified that if a one-hour sitting and standing interval was introduced, the number of available jobs would be reduced by 50%.[54]  And Ms. Lees testified that if the hypothetical individual's residual functional capacity was changed from "light" to "sedentary," there would not be any jobs that the individual could perform.[55]

III.    **The ALJ's Decision and Mr. Eason's Appeal**

On December 20, 2012, the ALJ issued a decision finding Mr. Eason had not been under a disability within the meaning of the Social Security Act since November 5, 2011, the date his application was filed.[56]  Mr. Eason timely requested review by the Social Security Appeals Council.[57]  On February 11, 2014, the Appeals Council denied that request for review.[58]

Mr. Eason then sought judicial review of the ALJ's findings by this Court pursuant to 42 U.S.C. § 405(g).[59]

---

[53] A.R. 71–72.  Ms. Lees testified that 15,980 positions for a bobbin stripper and 235,910 positions for a small products assembler exist in the national economy.

[54] A.R. 73.

[55] A.R. 72.

[56] A.R. 22.

[57] A.R. 18.

[58] A.R. 1.

[59] Docket 1 (Complaint) at 1.

**DISCUSSION**

## I.    The Disability Determination Process and the ALJ's Findings

The Social Security Act provides for the payment of benefits to disabled individuals who satisfy certain income and resource eligibility criteria.[60]  Disability is defined as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[61]

The Social Security Commissioner has established a five-step process for determining disability.[62]  At Steps 1 through 4, the claimant bears the burden of proving his entitlement to disability benefits; at Step 5, the burden shifts to the Social Security Commissioner to show there is gainful activity the claimant can perform.[63]

At Step 1, the claimant must show he is not currently engaged in substantial gainful activity.[64]  At Step 2, the claimant must demonstrate that his impairment is "severe," i.e., an impairment that "significantly limits [his] physical or mental ability to do basic work

---

[60] 42 U.S.C. §§ 1381–1382; 42 U.S.C. § 423.

[61] 42 U.S.C. § 1382c(a)(3)(A).  This definition of disability for SSI purposes mirrors the definition of disability for DIB purposes.  *See* 42 U.S.C. § 423(d)(1)(A).  Disability regulations for the SSI and DIB programs also mirror each other.  Accordingly, case law dealing with one program is generally relevant to both programs.  In setting out the legal standard, the Court cites to regulations for both programs.

[62] 20 C.F.R. § 404.1520(a)(1); 20 C.F.R. § 416.920(a)(4).

[63] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998)).

[64] 20 C.F.R. § 404.1520(a)(4)(i); 20 C.F.R. § 416.920(a)(4)(i).

activities" that has lasted or is expected to last for at least twelve months.[65]  At Step 3, if

the claimant proves his impairment is listed in 20 C.F.R. Part 404, Subpart P, Appendix

1, then the ALJ must conclude the claimant is disabled.[66]  If not, then the ALJ determines

the claimant's residual functional capacity ("RFC"), which is the most work the claimant

can still do despite his limitations.[67]  At Step 4, the ALJ uses the RFC to determine

whether the claimant is capable of performing his past relevant work.[68]  If the claimant

proves he cannot perform his past relevant work, then at Step 5 the Social Security

Commissioner must show—based on the claimant's RFC, age, education, and work

experience—that the claimant is capable of performing other work that exists in significant

numbers in the national economy.[69]  If the claimant can make an adjustment to such other

work, he is not disabled.  If he is not able to do any other work, then he is considered

disabled.[70]

In this case, prior to applying the five-step approach, the ALJ concluded that due

to Mr. Eason's deepening depression, the presumption of continuing non-disability that

---

[65] 20 C.F.R. § 404.1520(a)(4)(ii), (c); 20 C.F.R. § 404.1509; 20 C.F.R. § 416.920(a)(4)(ii), (c); 20 C.F.R. § 416.909.

[66] 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. § 416.920(a)(4)(iii).

[67] 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1).  The ALJ makes the RFC determination based on "all of the relevant medical and other evidence," including "descriptions and observations of [the claimant's] limitations" provided by the claimant and others.  *Id.* § 404.1545(a)(3); 416.945(a)(3);.

[68] 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 416.945(a)(4)(iv).

[69] 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 416.945(a)(4)(v); 20 C.F.R. § 404.1566 (defining the "significant numbers" requirement).

[70] *Id.*

would otherwise result from his prior denial of benefits did not apply.[71]  At Step 1, the ALJ

found that Mr. Eason had not engaged in substantial gainful activity since the alleged

onset date of November 5, 2011.[72]  At Step 2, the ALJ found that Mr. Eason had the

following severe impairments: facet arthropathy of the lumbar spine, diabetes mellitus,

hypertension, obesity, and depression.[73]  At Step 3, the ALJ found that Mr. Eason did not

have an impairment or combination of impairments that met or medically equaled the

severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[74]

The ALJ then determined that Mr. Eason had the RFC to

> perform light work . . . except the claimant is limited to
> occasional climbing of ramps, stairs, ladders, ropes or
> scaffolds; occasional stooping, crouching and crawling; must
> avoid concentrated exposure to extreme cold and excessive
> vibration; and is limited to work involving 1- to 2-step tasks
> with few workplace changes and providing verbal rather than
> written instructions.[75]

In making his finding, the ALJ discussed Mr. Eason's alleged impairments and symptoms,

including those he self-reported.  Although the ALJ found that Mr. Eason's "medically

determinable impairments could reasonably be expected to cause the alleged

symptoms," he did not find Mr. Eason's "statements concerning the intensity, persistence,

---

[71] A.R. 22–23; *see supra* note 6; Chavez *v. Bowen*, 844 F.2d 691 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove changed circumstances indicating a greater disability.") (internal quotation marks omitted).

[72] A.R. 24.

[73] *Id.*

[74] A.R. 25.

[75] A.R. 27.

and limiting effects of these symptoms wholly credible."[76]  At Step 4, the ALJ found that

Mr. Eason was unable to perform any past relevant work.[77]  At Step 5, the ALJ found that

"considering [Mr. Eason's] age, education, work experience, and residual functional

capacity, there are jobs that exist in significant numbers in the national economy that [Mr.

Eason] can perform."[78]  Specifically, based on the testimony of Ms. Lees, the ALJ found

that Mr. Eason could perform the jobs of thread-cutter tender, bobbin stripper, or small

product assembler.[79]  Accordingly, the ALJ determined that Mr. Eason had not been

under a disability, as defined by the Social Security Act, since November 5, 2011.[80]

## II.    Standard of Review

The ALJ's denial of benefits to Mr. Eason should be set aside "only if it is not

supported by substantial evidence or is based on legal error."[81]  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support [the

ALJ's] conclusion."[82]  An ALJ's determination is based on legal error if the ALJ failed to

apply the proper legal standard.[83]  This Court "review[s] only the reasons provided by the

---

[76] A.R. 28–29.

[77] A.R. 34.

[78] *Id.*

[79] A.R. 35.

[80] *Id.*

[81] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012) (citing 42 U.S.C. § 405(g)).

[82] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[83] *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."[84]

## III.    Analysis

Mr. Eason presents four arguments in this appeal.  First, Mr. Eason asserts that the ALJ erred in formulating the RFC by failing to account for Mr. Eason's use of a cane. Second, Mr. Eason asserts that the RFC failed to account for Mr. Eason's asserted need to alternate positions.  Third, Mr. Eason asserts that the RFC failed to account for the ALJ's finding that Mr. Eason experienced moderate limitations of concentration, persistence, and pace.  Fourth, Mr. Eason asserts that the ALJ erred in making findings as to the jobs that Mr. Eason could perform in the national economy because the ALJ improperly relied on the testimony of the Vocational Expert regarding the number of steps in a job that Mr. Eason could perform.

### A.  Formulation of Mr. Eason's RFC

#### i.  Use of a cane

Mr. Eason asserts that the ALJ clearly erred by failing to include or account for Mr. Eason's need to use a cane in the RFC.  Mr. Eason identifies the following evidence in support of his need for a cane: the medical evidence that Mr. Eason suffers from back pain and has difficulty walking; the observation of Dr. Shields that Mr. Eason was using a cane; the Third Party Function Report submitted by Mr. Eason's longtime friend; and Mr. Eason's own testimony that he uses a cane that was prescribed for him by his prior

---

[84] *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

primary care physician.[85]  Mr. Eason asserts that the ALJ erred because "an ALJ must always include all of the limitations demonstrated in the record in his RFC finding or explain why they were excluded."[86]  The Commissioner responds that the ALJ set forth reasons to discredit Mr. Eason's testimony and the third party report, and adequately explained that although the "medical evidence shows that [Mr. Eason] did use a cane some of the time, [it] did not establish he actually needed to use a cane."[87]

Mr. Eason asserts that unambiguous agency policy requires the ALJ to address Mr. Eason's use of a cane in the RFC, citing Social Security Ruling 96-9p's statement that "the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities."[88]  However, an ALJ is not obligated to analyze an alleged physical limitation in the RFC when substantial evidence in the record as a whole does not support that the alleged limitation is, in fact, a limitation.[89]  Rather, the ALJ is obligated to adequately explain his consideration of the evidence in the record and then formulate an RFC based on that

---

[85] *See* Docket 17 (Brief) at 12; *see id.* at 8–11.

[86] *Id.* at 6.

[87] Docket 21 (Opp.) at 7–8.

[88] SSR 96-9P, 1996 WL 374185, *2; *see* Docket 17 (Brief) at 12.

[89] *See Ghanim v. Colvin*, 763 F.3d 1154, 1166 (9th Cir. 2014) ("An ALJ may rely on a vocational expert's testimony that is based on a hypothetical that 'contain[s] all of the limitations that the ALJ found credible and supported by substantial evidence in the record.'") (quoting *Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005)); *Bayliss*, 427 F.3d at 1217 ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary.")*.*

evidence.[90]   Here, there was no medical source testimony that the cane was prescribed or medically necessary.[91]   And Mr. Eason's counsel did not seek testimony from the Vocational Expert regarding the impact of the use of a cane and did not advocate to the ALJ that the cane was an additional limitation.[92]   Mr. Eason's use of a cane was noted by the ALJ as part of Mr. Eason's subjective severity of symptoms testimony.[93]   The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."[94]   However, the ALJ went on to reject some of Mr. Eason's statements as to the severity of his symptoms.

"[T]he ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so."[95]   "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."[96]

---

[90] *See* SSR 96-5P, 1996 WL 374183, *5 ("Adjudicators must weigh medical source statements under the rules set out in 20 CFR 404.1527 and 416.927, providing appropriate explanations for accepting or rejecting such opinions."); SSR 96-7P, 1996 WL 374186, *5 ("When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.").

[91] *See* A.R. 28, 32–33; *Lewis v. Apfel*, 236 F.3d 503, 512–13 (9th Cir. 2001) (ALJ did not err when, despite failing to make specific findings as to nature and frequency of claimant's seizures, he discussed and evaluated evidence to support his conclusion that claimant's symptoms did not persist when on medication).

[92] *See* A.R. 303–04 (Letter to ALJ).

[93] A.R. 28 ("He reported that he uses a walking cane every day.").

[94] A.R. 28.

[95] *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)).

[96] *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

Here, the ALJ addressed why Mr. Eason's testimony was given limited weight.[97]  After discussing the medical records regarding Mr. Eason's back injuries, the ALJ found that "[c]onsidering the radiographic evidence, the EMG/NCV report, the lack of consistent clinical examination findings, the conservative nature of the treatment, and the evidence suggesting the claimant did not give a full effort during examinations, I find that the claimant's allegations of back pain and lower extremity symptoms are not wholly credible."[98]  And after discussing Mr. Eason's medical records regarding diabetes, the ALJ found that "[c]onsidering the lack of supporting objective evidence, the lack of persistent symptoms, and the claimant's refusal to follow his doctor's recommendations, I find no credible evidence that the claimant experiences disabling . . . lower extremity pain and numbness."[99]  Although the ALJ did not specifically reject Mr. Eason's testimony that he requires a cane to function, the ALJ presented clear and convincing reasons for rejecting Mr. Eason's subjective testimony as to the severity of those symptoms that would require him to use a cane.  In light of the ALJ's adverse credibility determination and paucity of medical source evidence demonstrating that the cane was a medical necessity,[100] the Court finds that the ALJ did not err in not including Mr. Eason's use of a cane as a limitation in the RFC.  And as a consequence, Mr. Eason's arguments that the ALJ's job findings constituted clear error because the RFC failed to include mobility

---

[97] *See* A.R. 28–29 (credibility finding as to Mr. Eason); A.R. 33 (credibility finding as to Ms. Tinal, Mr. Eason's friend who submitted a Third-Party Function Report).

[98] A.R. 30.

[99] A.R. 30.

[100] *See supra* note 40.

limitations due to use of a cane are likewise unpersuasive.

    *ii. Failure to include a limitation of physically alternating positions through the day*

Mr. Eason asserts that the ALJ erred by failing to include as a limitation in the RFC a need for Mr. Eason to physically alternate positions throughout the workday. He cites to a portion of the Physical Work Performance Evaluation that states that "[d]ue to [Mr. Eason's] limited ability to walk and stand, he would have to alternate between standing, walking, and other tasks as listed in the task performance table to be able to tolerate the Light level of work for the 8-hour day/40 hour week."[101] But that assessment also states "[p]lease note that the tolerance for the 8-hour day was significantly influenced by [Mr. Eason's] self-limiting behavior and indicates his minimal rather than his maximal ability."[102]

The ALJ noted both the evaluator's finding and Mr. Eason's self-limiting behavior during the evaluation in his decision.[103] And the ALJ elicited testimony from the Vocational Expert on "a sit/stand option . . . allowing the individual to alternate sitting or standing positions at one hour intervals throughout the day."[104] The Vocational Expert testified that the additional restriction would "erode the numbers" of available jobs in the

---

[101] Docket 17 (Brief) at 15 (citing A.R. 334).

[102] A.R. 334. Similarly, Dr. Shields noted that Mr. Eason "[c]annot do heavy or medium level work, but could do light level with [the accommodation of changing positions]." A.R. 344.

[103] A.R. 30.

[104] A.R. 73.

national economy by "approximately 50 percent."[105]   In light of the Vocational Expert's testimony that there would still be suitable positions for Mr. Eason with a sit/stand limitation, the failure to expressly include an alternating-positions restriction in the RFC, if in error, was harmless.[106]

### iii. Failure to account for finding of moderate limitation of concentration, persistence, and pace

Mr. Eason's RFC specified that he is "limited to work involving 1- to 2- step tasks with few workplace changes and providing verbal rather than written instructions."[107]  Mr. Eason asserts that the ALJ erred because the RFC failed to adequately reflect the ALJ's finding that "[w]ith regard to concentration, persistence or pace, the claimant has moderate difficulties."[108]  Specifically in this regard, the ALJ found that:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  The claimant alleges severe cognitive limitations.  However, the medical evidence of record reveals no objective evidence of significant cognitive limitations.  However, his symptoms' persistence suggests depression interferes with his ability to sustain concentration, persistence or pace to some degree.[109]

---

[105] A.R. 73.

[106] *See Garcia v. Comm. of Soc. Sec.*, 708 F.3d 925, 932 (9th Cir. 2014) ("We will not reverse an ALJ's decision on the basis of a harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination.") (citation and internal quotation marks omitted); Docket 17 (Brief) at 16 ("Although this additional testimony, standing alone, might be considered 'harmless error,' in combination with the other errors of the ALJ set forth above, this additional erosion of the job base cannot be said, as a matter of law, to be harmless since additional vocational testimony which considers all of Mr. Eason's work-related limitations is the only remedy which can address the ALJ's errors.") (emphasis in original).

[107] A.R. 27.

[108] A.R. 26.

[109] A.R. 26.

In *Stubbs-Danielson*, the Ninth Circuit upheld an RFC that limited a claimant to "simple, routine, repetitive sedentary work" to reflect medical evidence that the claimant had "a slow pace, both in thinking & actions" and had "several moderate limitations in other mental areas."[110]  The Circuit Court noted that "[t]he ALJ translated [the claimant's] condition, including the pace and mental limitations, into the only concrete restrictions available to him—[a doctor's] recommended restriction to 'simple tasks.'"[111] Citing similar holdings in two other circuits, the Ninth Circuit held that "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony."[112]

Here, unlike in *Stubbs-Danielson*, the nature of Mr. Eason's cognitive limitations are only evidenced in the record by Mr. Eason's self-reporting to his medical providers and testimony at the administrative hearing.[113]  And while there is significant medical source evidence that Mr. Eason suffered from depression, the ALJ found that "[c]onsidering the lack of treatment for depression related symptoms until well after the alleged disability onset date, the lack of significant clinical findings suggesting limitations,

---

[110] *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173–74 (9th Cir. 2008).

[111] *Id.* at 1174.

[112] *Id.* at 1174 (citing *Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir.2001); *Smith v. Halter,* 307 F.3d 377, 379 (6th Cir.2001)).

[113] *See* A.R. 289.  Likewise, Mr. Eason's illiteracy is unsupported in the record beyond his own testimony (A.R. 32), but was incorporated into the RFC by the limitation that Mr. Eason receive "verbal rather than written instructions" in his employment.

and the apparent effectiveness of treatment, I do not find the claimant's depression related allegations wholly credible."[114] With limited evidence of cognitive limitations before him, the ALJ concluded that the fact that Mr. Eason's "depression interferes with his ability to sustain concentration, persistence or pace to some degree" supported an RFC limitation of "limited to work involving 1- to 2- step tasks with few workplace changes and providing verbal rather than written instructions." After reviewing that evidence, the Court finds that the ALJ's approach is consistent with *Stubbs-Danielson* and adequately captured the nature of Mr. Eason's mental limitations in the RFC.[115]

---

[114] A.R. 32.

[115] Moreover, it is notable that the ALJ found Mr. Eason's self-reported limitations not wholly credible. A.R. 31–32. Given the lack of medical evidence of Mr. Eason's cognitive limitations, the ALJ's finding of moderate cognitive limitations could be set aside as not supported by substantial evidence, in which case the additional limitations in the RFC would be harmless error because they favored Mr. Eason.

Mr. Eason's citation to *Brink v. Comm'r Social Sec. Admin.*, 343 F. App'x 211 (9th Cir. 2009) is not persuasive. As an initial matter, that case is an unpublished memorandum disposition that contains only limited factual background. In *Brink*, the ALJ accepted medical evidence that the claimant had difficulties with concentration, persistence, and pace. The ALJ posed a hypothetical to a Vocational Expert that included a limitation of "simple, repetitive work," and the Vocational Expert testified that jobs existed for the hypothetical person. The ALJ then posed a hypothetical that included a limitation for "moderate to marked attention and concentration deficits," and the Vocational Expert testified that the hypothetical person would be unable to perform any jobs with that limitation. The ALJ ultimately found the claimant not disabled using the "simple, repetitive work" limitation. The Circuit Court found that only the ALJ's second hypothetical incorporated the claimant's cognitive limitations and that because the ALJ made his findings relying on the Vocational Expert's testimony as to his first hypothetical only, his findings were not supported by substantial evidence. *Id.* at 212. Unlike in *Brink*, the ALJ here clearly intended for his hypothetical to incorporate Mr. Eason's cognitive limitations, evinced most notably by the hypothetical limitation to verbal instructions. And unlike in *Brink*, there is limited medical evidence of cognitive impairment in the record in this case. Having already found that the RFC adequately captured the nature of Mr. Eason's cognitive limitations, the ALJ did not err in formulating his hypothetical and therefore could rely on the Vocational Expert's responsive testimony as substantial evidence to conclude that jobs existed in the national economy that Mr. Eason could perform.

### B. The ALJ's reliance on the Vocational Expert's evidence to identify jobs Mr. Eason could perform

Mr. Eason asserts that each of the three jobs the Vocational Expert identified as jobs Mr. Eason could perform given his RFC require more than 1 to 2 steps. Accordingly, Mr. Eason asserts that the ALJ erred in relying on the Vocational Expert's testimony without addressing the discrepancy between the DOT descriptions of those positions and Ms. Lees's testimony that Mr. Eason could perform those jobs.[116] In her opposition brief, the Commissioner concedes that the job of thread cutter tender, with a reasoning level of 3, "may be precluded in this case" due to Mr. Eason's alleged illiteracy.[117] But the Commissioner asserts that for the other two jobs, Mr. Eason conflates the number of tasks required by each job with the number of steps required to perform any given listed task.[118]

The Court finds that one of the jobs identified by Ms. Lees—bobbin stripper—has a DOT description that requires tasks of more than 1 to 2 steps.[119] The "task" in the description of that job is the overall tending of the stripper, which clearly involves numerous sequential steps.[120] The ALJ provided no explanation for the conflict between

---

[116] Docket 17 (Motion) at 4–8.

[117] Docket 21 (Opp.) at 19.

[118] Docket 21 (Opp.) at 16–18.

[119] **Bobbin stripper**: DOT Code 689.685-022:  Tends stripper that removes thread residue from brass bobbins to prepare bobbins for rewinding:  Loads bobbins on shaft of stripping device and ties thread ends to reel at bottom of stripper.  Pulls lever to start device that strips thread from bobbins and winds thread onto reel.  Removes bobbins from shaft and holds bobbins in front of light to detect thread particles clinging to base or sides of bobbin.  Inserts searcher between disks to remove thread particles.

[120] *See* Docket 17 (Brief) at 6.

his determination that Mr. Eason's RFC required him to perform light work involving 1- to 2-step tasks, Ms. Lees's determination that Mr. Eason could perform the work of bobbin stripper, and the DOT's description of those tasks as requiring more than one or two steps.  Because Social Security regulations require such an explanation before the ALJ may rely on a Vocational Expert's evidence, the ALJ erred in relying on the Vocational Expert's evidence that Mr. Eason could perform the bobbin stripper job.  And without consideration of the evidence of the Vocational Expert, the Court finds that the ALJ's determination that Mr. Eason could perform the job of bobbin stripper was not supported by substantial evidence.[121]

Unlike the description for bobbin stripper, the DOT description for "small products assembler" describes a series of discrete, repetitive tasks that such a worker might engage in.[122]  However, Mr. Eason asserts that the ALJ erred in finding that Mr. Eason's RFC permitted him to perform that job because Mr. Eason's RFC limits him to workplaces

---

[121] *See* SSR 00-4p (requiring that "before relying on [Vocational Expert] evidence to support a disability determination or decision" adjudicators must "[id]entify and obtain a reasonable explanation for any conflicts between occupational evidence provided" and information in the DOT and "[e]xplain in the determination or decision how any conflict that has been identified was resolved").

[122] **Small products assembler**: DOT Code 706.684-022:  Performs any of a combination of following repetitive tasks on assembly line to mass produce small products, such as ball bearings, automobile door locking units, speedometers, condensers, distributors, ignition coils, drafting table subassemblies, or carburetors:  Positions parts in specified relationship to each other, using hands, tweezers, or tongs.  Bolts, screws, clips, cements, or otherwise fastens parts together by hand or using handtools or portable powered tools.  Frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker.  Loads and unloads previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or broaches, to perform fastening, force fitting, or light metal-cutting operation on assembly line.  May be assigned to different work stations as production needs require or shift from one station to another to reduce fatigue factor. May be known according to product assembled.

"with few workplace changes and providing verbal rather than written instructions," while the small products assembler position notes that a worker "may be assigned to different work stations as production needs require or shift from one station to another to reduce fatigue factor."[123]  However, the Court agrees with the Commissioner that the DOT description contemplates "routine variations in the same job" and does not directly conflict with Mr. Eason's RFC.

Mr. Eason raises an additional challenge to the finding that he can perform the duties of a small products assembler.  He asserts that the DOT description of small products assembler has a "reasoning level" of 2, and therefore the job is "plainly inconsistent with a limitation to 1-2 step tasks; jobs requiring 1-2 step tasks are explicitly defined in the DOT as 'reasoning level 1.'"[124]  The Commissioner responds that numerous district and circuit courts have held that a limitation to 1- to 2-step tasks in a claimant's RFC does not limit the claimant to only those jobs having a reasoning level of 1.  Upon review of those cases, the Court agrees that no inherent conflict exists between the small products assembler position's reasoning level of 2 and the RFC's 1- to 2-step task limitation.[125]  Because substantial evidence supports the determination that Mr. Eason can perform the job of a small products assembler with a limitation of physically alternating positions, a job which exists in significant numbers in the national economy, the Commissioner's finding that Mr. Eason was not disabled will be affirmed.

---

[123] Docket 17 (Motion) at 6.

[124] Docket 17 (Motion) at 7–8.

[125] The Court found particularly helpful the analysis of the interaction between the social security regulations and DOT descriptions in *Meissl v. Barnhart*, 403 F. Supp. 2d 981 (C.D. Cal. 2005).

**CONCLUSION**

For the reasons set forth above, the Commissioner's finding that Mr. Eason was not disabled, as defined under the Social Security Act, is AFFIRMED. The Clerk of Court shall enter judgment in favor of the Commissioner.

DATED this 31st day of August, 2015.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE